1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERTO CORTEZ,<br><br>   Petitioner,<br><br> v.<br><br>R. LOPEZ, Warden,<br><br>   Respondent. | Case No.: 1:11-cv-01761-AWI-JLT<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING THAT OBJECTIONS BE FILED WITHIN TWENTY-ONE DAYS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is in custody of the California Department of Corrections and Rehabilitation serving an indeterminate sentence of sixty years-to-life pursuant to a judgment of the Superior Court of California, County of Merced (the "Superior Court"). This followed his October 16, 2008 conviction following a jury trial for multiple counts of continuous sexual abuse of a child (Cal. Pen. Code § 288.5) and for lewd and lascivious contact with three separate victims (Cal. Pen. Code § 288(a)). Petitioner was sentenced by the trial court under California's "one strike" law set forth in California Penal Code § 667.61. Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("5th DCA"). On June 22, 2011, in an unpublished opinion, the 5th DCA affirmed the conviction but

1

1 | dismissed the one strike findings as to two of the counts, ruled that Petitioner could not be convicted
2 | of continuous sexual abuse in conjunction with the § 288 counts against the same victims and
3 | remanded the case for resentencing.  (Doc. 14, Lodged Documents ("LD") 4).  On August 31, 2011,
4 | the California Supreme Court denied Petitioner's petition for review.  (LD 3).

On October 24, 2011, Petitioner filed the instant petition.  (Doc. 1).  Respondent's answer was filed on January 26, 2012.  (Doc. 13).  Petitioner has not filed a Traverse.  Respondent argues that ground one is not exhausted, but otherwise does not contend that the remaining claims are unexhausted.  (Doc. 13).

**FACTUAL BACKGROUND**

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

Defendant was involved in romantic relationships with three women: Sophia G., Angelica C., and Emma C., and he lived with these women during separate time periods from approximately 1998 to 2007. While he was involved with these women, he sexually molested their young daughters, Y.C., C.C., and S.C., and threatened to harm them if they told anyone about the molestations. Defendant was not the children's father.

Another girl involved in this case, R.C., is the daughter of defendant and Sophia G. Defendant was not charged with molesting R.C., but R.C. occasionally stayed with her older half-sister, Y.C., and the other children when defendant was involved with their mothers. As we will explain, post, R.C. testified for the prosecution that she saw defendant touch Y.C.

We will review the facts in sequential order, based on the counts and the relevant time periods.

**Y.C.—Counts VI, VII and VIII (April 4, 1998, to April 3, 2000)**

Y.C. was 16 years old at the time of defendant's trial in 2008. Y.C.'s mother is Sophia G. Defendant became Sophia's boyfriend when Y.C. was six or seven years old.

Y.C. testified that defendant touched her for the first time when she was six or seven years old. The incident occurred when she was sleeping on the bedroom floor, next to the bed where defendant and her mother were sleeping. Defendant let his arm hang from the bed over Y.C., put his finger in her mouth, and asked her to suck it. Y .C. testified she did not want to do the act, but she did so anyway.

Y.C. described another incident which occurred about six months later, in the summer, when the family was living in a different residence. Y.C.'s mother was working and defendant was babysitting Y.C. Defendant drove Y.C. to the store to rent a pornographic video. Defendant asked Y.C. if she liked two girls or a boy and a girl. Y.C. was confused and did not answer. Y.C. testified the movie box covers in the store "showed like a lot of nudity and they weren't movies that my mom would let me see if we were to go rent movies. I knew they were wrong."

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Thus, the Court adopts the factual recitations set forth by the 5th DCA.

2

Defendant told Y.C. to pick one and she did. When they got home, defendant made her watch the movie with him. The movie depicted naked adults having oral sex. Y.C. thought the movie was disgusting. It made her feel uncomfortable and she knew she should not be watching it.

After they watched the movie, defendant asked Y.C. if she liked what she saw and if she wanted to be like the girls in the movie. Defendant asked her to take off her clothes, and she complied but kept on her underwear. Defendant was wearing a shirt and boxer shorts. Defendant touched Y.C. in her "private places," he kissed her mouth, neck, and breasts, and he rubbed her vagina with his hands. Defendant touched her breasts, put his mouth on her vagina, and asked if she liked it. Defendant put Y.C.'s hands on his penis and told her to rub it. She did not want to do it. Defendant grabbed her hand and put it on his penis, and then guided her hand over it.

Y.C. testified about another incident which occurred when she was seven or eight years old. Defendant made Y.C. touch his penis with her mouth by pushing her head down.

Y.C. testified that almost every time that defendant wanted to touch her, he would play a pornographic video or make her look at a pornographic magazine, and then molest her again. Defendant never tried to bother her when her mother was around.

Y.C. testified that they moved to another residence when she was eight or nine years old, and defendant continued to touch her when her mother was at work. One incident occurred when she was sleeping in her mother's bed. She woke up and found defendant trying to kiss her. He tried to touch her vagina and breasts, and forced his tongue into her mouth. Y.C. tried to back away from him.

Y.C. testified she did whatever sexual acts defendant wanted her to do because "I didn't know what else to do. I was confused so I just did it. I don't really know why. I was scared of him, kinda." Y.C. testified that if she did not cooperate with him during the sexual acts, defendant would "just get really angry, and he'd lash out and get-and just started yelling at me, so I didn't know what else to do." Defendant told Y.C. that if she told anyone what they were doing, her mother would be upset and leave him, and her mother would be miserable without defendant. Defendant also warned Y.C. that her half-sister, R.C., would grow up without a father just like Y.C. did.

Y.C. believed defendant touched her in a sexual manner a total of 10 to 15 different times, on different days, over a period of more than three months.

When Y.C. was about 10 years old (around 2002), she told her older stepbrother about defendant's acts, but nothing happened as a result of that disclosure.

In 2005, Y.C.'s mother told Y.C. that two girls accused defendant of molesting them. Y.C.'s mother did not believe the girls' accusations. She asked Y.C. if defendant hurt her like he allegedly hurt the other girls. Y.C. told her mother that nothing had happened, even though defendant had already inappropriately touched her. The police also interviewed Y.C. about the accusations by the other girls, but Y.C. did not tell the police that she had been molested. Y.C. explained that she did not tell her mother or the police because she was still scared and not ready to talk about it. Y.C. knew the identities of the two girls who had accused defendant, but she never met them and did not talk to them about the accusations.

Y.C. testified that she finally told her mother about the molestations about 9 or 10 months before defendant's 2008 trial. Y.C. then told the police what happened.

Based on Y.C.'s testimony, defendant was charged and convicted of count VI, continuous

3

sexual abuse; count VII, commission of a forcible lewd act; and count VIII, commission of lewd or lascivious act, with all counts committed from April 4, 1998, to April 3, 2000. As to all counts, the jury found true the special allegation pursuant to the one strike law, that defendant was convicted in this case of committing an enumerated sexual offense against more than one victim. (§ 667.61, subds.(b), (e)(4).)

**C.C.—Counts III, IV, and V (August 31, 2002, to August 30, 2004)**

C.C. was 14 years at the time of trial.  C.C.'s mother is Angelica C.  C.C. was eight years old when she met defendant, who was her mother's fiancé. He started to live with her family when she was eight or nine years old.

C.C. testified that defendant first touched her inappropriately when she was eight years old. He touched her breasts, buttocks, and vagina with his hands. Defendant continued to molest C.C. when she was nine years old. When she was asleep, defendant would grab her hands and make her touch his penis. Defendant also forced her to kiss his lips "like I was his girlfriend." Defendant would get out of the shower and walk into her room naked.

C.C. described another occasion when she was sleeping, and defendant spread her legs and tried to insert his penis into her vagina. C.C. woke up and defendant stopped. Defendant also showed her pictures of naked women. When defendant wanted to touch C.C., she tried to push him away but he held her down and forced her to sit still. C.C. testified the molestations continued over a two-year period, and defendant molested her about 60 or 70 times. Defendant molested C.C. when her mother was at work. C.C. did not tell her mother about the molestations because defendant threatened her. Defendant said he would "hurt" her mother and the family. C.C. was scared and believed the threats, and she was still afraid of defendant at the time of trial.

At one point during defendant's relationship with C.C.'s mother, her mother was hospitalized and in a diabetic coma for several months. C.C. and her brothers alternated between living with defendant and their aunt during this time. Defendant continued to molest C.C. when she lived with him and her mother was in the hospital.

In approximately 2005, while her mother was still in the hospital, C.C. told her aunt that defendant was touching her. Her aunt contacted the police and there was an investigation. C.C. did not know S.C. or Y.C. at that time.

On April 8, 2005, C.C. was interviewed by a social worker who served as a forensic interviewer for the police department. During that interview, C.C. said defendant began touching her when she was about eight years old. C.C. said that nearly every night, he would quietly go into her bedroom while everyone was asleep and touch her body under her clothes. He put his hand on her private area and bottom and tried to rub her body. C.C. tried to push him away but he kept touching her. C.C. described an incident when defendant was taking a shower, and he walked in with his pants open and showed his penis to her, and tried to make her touch it. C.C. described another incident when she was almost nine years old. She was asleep, defendant pulled off her blankets and sat on her, and he tried to put his penis into her vagina and bottom. C.C. held her legs tightly together and resisted. On another occasion while she was sleeping, defendant put her hand on his penis and tried to make her touch it "in the wrong way." Defendant pushed her head and tried to make her put her mouth on his penis. C.C. pushed him away, but defendant repeatedly tried to make her touch his penis. C.C. said defendant did these things at night for probably an entire year. He stopped for a few months, but then he started again when her mother went into the hospital. C.C. said she tried to sleep with her brothers so defendant wouldn't bother her at night.

4

While there was an investigation into C.C.'s reports in 2005, no criminal charges were filed against defendant at that time. C.C.'s mother eventually recovered from her illness, and she broke up with defendant.

In 2008, C.C. and her mother read in the newspaper that defendant was arrested for molesting two other girls. They contacted the police and again reported that defendant had molested C.C.

Based on C.C.'s testimony, defendant was charged and convicted of count III, continuous sexual abuse; count IV, commission of a lewd or lascivious act; and count V, commission of a forcible lewd act (§ 288, subd. (b)(1)), with all counts committed from August 31, 2002, to August 30, 2004. As to all counts, the jury found true the special allegation pursuant to the one strike law, that defendant was convicted in this case of committing an enumerated sexual offense against more than one victim. (§ 667.61, subds.(b), (e)(4).)

**S.C.—Counts I and II (June 7, 2005, to June 6, 2007)**

S.C. was 15 years old at the time of trial. Emma C. is S.C.'s mother. Emma started dating defendant in 2005, and he lived with the family for three years.

Emma testified that when she starting dating defendant, she heard that he was accused of molesting a girl and asked him about it. Defendant told Emma about C.C.'s allegations and said he was falsely accused and never arrested. Defendant said another person in the girl's family had molested her.

Emma testified that when they lived together, defendant had pornographic movies and magazines in the house, and these items depicted young girls and adults having sex. She saw defendant look at adult pornography on the computer. Emma never suspected that defendant was molesting S.C., and S.C. never said that defendant touched her.

S.C. testified that defendant started to touch her when she was 13 years old. S.C. testified that on one occasion, defendant came into her bedroom and touched her chest, both over and under her clothes. Defendant also put his hand on her vagina. Defendant put his mouth on her vagina and licked it. Defendant pulled down his pants and told her to look at his penis. Defendant once called her to look at their home computer, and he showed her a picture of a naked girl who looked 13 or 14 years old.

S.C. testified that defendant touched her three or four times, on different days, over a period longer than three months. The incidents only happened at night. S.C. always cried after defendant touched her and she was afraid of him. S.C. did not try to stop defendant because she was scared of him. Sometimes she pushed defendant away with her arms, and he left her alone and did not use any force against her. Defendant threatened to tell her mother about "'the things we do.'" S.C. did not tell anyone because she was afraid that her mother would not believe her and send her away.

**S.C. talks to the police**

On January 29, 2008, Emma reported to Officer Anthony Bleha that defendant was physically abusing her. In the course of that investigation, S.C. told Officer Bleha that defendant had molested her. Emma did not know that defendant had molested S.C. until her daughter told the police that day.

S.C. testified that she told Officer Bleha that defendant molested her, and her mother did not tell her to make up the story. S.C. did not know that defendant had previously been accused of improperly touching another girl.

5

Emma testified that immediately after defendant was arrested in this case, she called Sophia G., the mother of Y.C. and R.C., to tell her what happened. Sophia revealed that defendant had also molested Y.C. Emma did not know about Y.C.'s allegations prior to that time.

Based on S.C.'s testimony, defendant was charged with count I, continuous sexual abuse; and count II, commission of a lewd or lascivious act (§ 288, subd. (a)), with all counts committed from June 7, 2005, to June 6, 2007.

Defendant was found not guilty of count I, continuous sexual abuse of S.C. Defendant was convicted of count II, commission of a lewd act on S.C, and the jury found true the special allegation pursuant to the one strike law, that defendant was convicted in this case of committing an enumerated sexual offense against more than one victim. (§ 667.61, subds.(b), (e)(4).)

**Defendant's arrest and statement**

On January 29, 2008, Officer Bleha arrested defendant in this case. Bleha advised defendant of his constitutional rights and defendant waived his rights.

Officer Bleha interviewed defendant and asked if he had inappropriately touched S.C. at any time in the previous two years. Defendant said, "No, maybe jokin['] around, playin['] around, you know." Defendant further explained: "Goosing or you know, in the butt, pinching in the butt or anything like that." Defendant added that they had "done it before, you know, playing reverse and stuff," but insisted he did not do anything "bad."

Bleha asked defendant if he was previously accused of such conduct. Defendant said about four years earlier, his previous girlfriend said he slept with her daughter when she was in the hospital. Defendant said there was a big "commotion" and investigation, but nothing was done about it.

Officer Bleha advised defendant that S.C. said he had touched her body and chest, and asked defendant for his side of the story. Defendant said he might have accidentally touched S.C.'s breasts while hugging her, and said he did not touch S.C. below the waist.

Officer Bleha said he had talked to S.C. and doubted that defendant was telling the truth. Defendant said that if he touched S.C. "in an inappropriate way," or if S.C. felt he touched her in a "bad way," then he "apologize[d]" and he "didn't mean nothing." Bleha asked defendant if he inappropriately touched S.C. while tucking her into bed. Defendant said that if he "accidentally did that, you know, I'm sorry. OK? If I accidentally did that I probably did. Not, not purposely." Bleha asked defendant about S.C.'s report that he touched her skin. Defendant said he "actually might have, ok, but not purposely, no," and he could have rubbed her stomach when she went to bed.

Officer Bleha again asked defendant how he touched S.C. Defendant said that "at the time ... it didn't seem inappropriate." Bleha asked defendant if he thought it was appropriate. Defendant said: "No, no I didn't think it was ok, but you know, I, I was in; I didn't think she was going to take it that way or whatever or I accidentally I touched her." Defendant said S.C. should have told him or her mother if she felt defendant touched her inappropriately so he would stop.

Officer Bleha asked defendant if S.C. might have been too scared to say anything. Defendant said that S.C. had supposedly been molested in the past when she was a little girl. Bleha asked defendant if he accidentally put his hand on S.C.'s breast when he tucked her into bed. Defendant initially said no, but then said, "[y]eah, maybe I got the urge and say ok, you know,

6

I said, yeah." Defendant said that if he did so, he pulled his hand away immediately.

Officer Bleha asked defendant if he had any fantasies about younger women, and whether Bleha would find anything at his house. Defendant said that S.C. might have "mentioned the computer." Defendant admitted he looked for pornography on the computer but only for women who were "over 18 years old." Defendant admitted he had looked at pornography sites which showed adult women who looked like minors.

Officer Bleha suggested that defendant had a problem since he had been previously accused of child molestation and he searched the Internet for websites that showed girls who looked underage. Defendant said he did not know if he had a problem, but he only looked at girls who were over 18 years old: "[T]hey look like it, but they're all over 18." Bleha again said that defendant had a problem, and defendant said "there probably is a problem."

Officer Bleha advised defendant that an emergency protective order had been issued to prevent defendant from contacting Emma and her children for "quite a while." Bleha also advised defendant to tell the truth so he could move on in his life. Defendant said he might have touched S.C. in an inappropriate way but not for sexual arousal. Defendant said he had been touched when he was a child and he knew it was an awful feeling. Defendant repeatedly said he was sorry, but he didn't mean it and he did not have any "nasty thoughts."

Officer Bleha asked defendant if he wanted to write a letter to Emma about whatever was on his mind. Bleha advised defendant that he was going to be arrested for child sexual battery, "which is touching someone inappropriately," and they would go from there. Bleha again advised defendant that he could not be in contact Emma. Defendant repeatedly asked if Emma wanted to talk to him. Bleha explained that Emma requested the emergency protective order. Defendant asked if there was any way he could call Emma, and he asked whether Emma was upset. Bleha asked defendant what he thought about that, and defendant agreed that she was probably upset. Defendant repeatedly said he wanted to talk to Emma. Bleha again told defendant he could not call or see her because of the protective order, but he had the option of writing to her.

Officer Bleha testified that at the end of the interview, he gave defendant some paper and defendant wrote a letter to Emma. The letter said:

> "Emma I love you and I am sorry for whatever I did[.] I don't mean any harm to you or your kid's [sic ][.] I hope you have a better life without me [.] [L]ove Robert."

**Defendant's telephone calls to Emma**

Emma testified defendant called her from jail after he was arrested. During those calls, he asked Emma to "drop the charges" and said he was "sorry." Defendant told Emma that he was "'halfways' asleep then awake" when he touched S.C.

**R.C.'s testimony**

R.C. is the daughter of defendant and Sophia G. At the time of the trial, R.C. was 10 years old. R.C. was not alleged to have been a victim in this case. However, R.C. knew the three victims because her father had been involved with their mothers. She called Y.C. her "real sister" because they shared the same mother (Sophia). R.C. described S.C. and C.C. as her stepsisters.

R.C. testified that she saw defendant improperly touch S.C. on a "private spot." R.C. could not remember how old she was when she saw this act, but knew she was younger when she saw it happen. R.C. saw defendant looking at naked girls on the computer, including a photograph in

which S.C.'s head was pasted on the bodies of "nasty" ladies.

**Count IX—Pornography on the computer**

Emma testified that after defendant was arrested, she discovered pornographic photographs that had been saved on their home computer. Emma testified that one photograph depicted a young girl whose blouse had been lowered, the girl looked about 10 years old, she was asleep, and a guy had his finger in the sleeping girl's mouth. Emma discovered other pictures on the computer which depicted naked adults and young girls.

Emma also found a photograph in the master bathroom which depicted a naked girl. The picture had been cut out of a pornographic magazine. It was modified so that S.C.'s face had been cut out of another photograph and placed on the picture of the naked child's body.

Detective John Ramirez examined the computer and found a total of 5,000 photographs on it. Most of the nude photographs depicted adult women, but 43 photographs depicted individuals who appeared to be under the age of 18 years old. There were pornographic images of several girls and one boy who appeared to be under 18 years old. They were either naked or wearing lingerie-type clothing and posed in sexual positions or engaged in sexual acts. Ramirez determined that the computer had been used to visit teenage pornography websites, including one called "Barely Legal."

Defendant was charged with count IX, misdemeanor sexual exploitation of a child through pornography (§ 311.3, subd. (a)). The jury was unable to reach a verdict on this count and the court declared a mistrial.

**The prosecution's expert**

Dr. Anthony Urquiza testified as an expert about child sexual abuse accommodation syndrome (CSAAS). Dr. Urquiza testified the components of CSAAS are secrecy; helplessness; entrapment and accommodation; delayed and unconvincing disclosure; and retraction or recantation.

Dr. Urquiza testified there were several myths about child abuse, including that children are usually sexually abused by strangers; children report right away when they are sexually abused; the child would have screamed or yelled to fight off the perpetrator; you can look at a child and tell if that child had been abused; and children can report a molestation in clear and articulate words. Dr. Urquiza testified that extensive research showed these were myths. A child usually knows the person who commits the molestation, and that person is usually a relative or someone with whom the child has an ongoing relationship. There is usually a delay of months or years before a child will report the molestation.

Dr. Urquiza had not examined, interviewed, or treated any of the children involved in this case.

**DEFENSE EVIDENCE**

**Alejandro Cortez**

Alexjandro Cortez (Alejandro), defendant's brother, testified that he visited defendant when he lived with Emma C., and he saw pictures of naked women on the computer in their residence. Defendant often had male friends at the residence, and Alejandro saw those friends using the computer. Alejandro also saw Emma looking at pictures of naked women on the computer. Emma gave defendant a pornography video as a Father's Day gift, and she called it a "hoochie

video."

Alejandro testified that Sophia G., the mother of R.C. and Y.C., broke up with defendant because she caught him cheating. Alejandro said that Sophia was "really upset" about the breakup. Sophia told Alejandro that defendant would "pay for what he did." Alejandro admitted he had not talked to Sophia in nearly a decade.

On cross-examination, Alejandro admitted he never told the police about Sophia's threat, even though he knew defendant had been arrested in this case. He did not tell defense counsel about Sophia's threat until the week before his trial testimony. Alejandro admitted that he saw defendant look at pornographic photographs on the computer, but the pictures showed adult women and not minors. Alejandro was shown photographs of naked women which had been found on defendant's computer. Alejandro admitted the pictures appeared to depict minor girls, but testified he had never seen those imagines on defendant's computer.

**Sophia G.**

Sophia G., the mother of Y.C. and R.C., testified she broke up with defendant in 1999 because he was involved with lots of other women. After they broke up, defendant occasionally picked up R.C. for visits.

Sophia testified that in 2005, an official from Child Protective Services visited her and spoke to her daughter, R.C. Sophia learned that defendant was being investigated for molesting another child, C.C. Sophia later talked to defendant about C.C.'s allegations, but she was not satisfied with his answers.

Sophia testified that around September 2007, her daughter, Y.C., told her that defendant had molested her. Y.C. was frightened and afraid for the safety of R.C., her younger sister. In October 2007, Sophia called the police department, but she was told that she called the wrong jurisdiction because defendant lived in another county.

Sophia testified that, in 2008, Emma called her and reported that defendant had been arrested for molesting S.C. Emma did not give any details but told Sophia to watch out for R.C.'s safety. Sophia called the officers investigating S.C.'s allegations and reported what happened to Y.C.

**Defendant's trial testimony**

Defendant admitted he had romantic relationships with the mothers of the three victims. Defendant described himself as a "father figure" to Sophia's daughter, Y.C. Defendant testified he showed his affection to both Y.C. and his own child, R.C., through hugs and kisses.

Defendant completely denied all the allegations made against him by Y.C., C.C., S.C., and R.C. Defendant denied that he touched Y.C.'s breasts or molested her in any way. Defendant testified he never touched S.C. in an improper way. Defendant also denied that he touched C.C.'s vaginal area, breasts, or her body in any type of bad way.

Defendant denied showing pornography to any of the victims, and testified that Emma spent a lot of time on the computer and it belonged to her. Defendant believed Emma downloaded pornography on the computer because she was interested in adult material. Defendant denied having any interest in child pornography and only claimed "some" interest in adult pornography. Defendant said he had never seen the nude photographs recovered from their home computer, including the photographs of girls who appeared under age.

9

Defendant testified that when C.C.'s mother became ill, C.C. spent more time with her aunt and the child changed her attitude about defendant. C.C. made her allegations against defendant after she was living with her aunt. Defendant said an officer arrived at his house, advised him about C.C.'s accusations, conducted a patdown search, and placed him in a patrol car. Defendant answered the officer's questions, he was released, and nothing else happened at that time.

Defendant testified that when he started dating Emma, S.C.'s mother, he told her that he had been falsely accused of child molestation in 2005. Emma always brought up the false accusation when they argued, and threatened defendant that "if I was to ever leave her that she was gonna [sic] accuse me of being a child molester." Emma threatened to falsely accuse him of child molestation on "maybe" more than 10 occasions.

Defendant testified that on January 29, 2008, he told Emma that he wanted to leave her because she was too jealous. They argued and Emma said, "I'm going to tell the police that you're a child molester. You molested my daughter," referring to S.C. Defendant was scared about the accusations, and he drove Emma and her children to the police station to clear things up. They continued to argue during the drive. When they arrived at the police station, S.C. asked her mother whether she should "go tell 'em that he's molested me? What do I do, Mom?" Upon hearing this exchange, defendant said that if she thought he was doing that, then "let's take care of this because I'm tired of you accusing me of molesting your daughter and that hanging over my head all the time."

Defendant testified he went into the police station and waited for an officer, but "nobody came by." He told Emma and the children that they should return to the house and work things out. He walked away from the police station, but then walked back and learned Officer Bleha was questioning S.C.

Defendant testified that Officer Bleha interviewed him the same day, but he did not know what Emma had accused him of doing. He cried during the interview because he had been molested by a relative when he was six years old, and he would never put "any kids through what I went through."

Defendant admitted he wrote a letter to Emma after the interview, and said that he loved her. Defendant also admitted he called Emma from jail, and he asked Emma not to let S.C. testify. Defendant claimed he made that request because "nothing happened." Defendant admitted he repeatedly told Emma that he loved her, and he never accused her of being part of a conspiracy or making up the charges during these calls. Defendant also admitted that he asked to speak to S.C. during one of his telephone calls from jail, even though Bleha told him about the restraining order.

Defendant admitted that when he was interviewed by Officer Bleha, he never claimed Emma was conspiring against him or falsely accusing him. Defendant never told Bleha that Emma threatened to blackmail him and falsely accuse him of child molestation. He said he failed to mention these matters because there were lots of things going through his mind during the interview.

At the time of his arrest, defendant did not think that the mothers of the three victims were conspiring against him. By the time of trial, however, he believed the three women were conspiring against him with their daughters, and they had been doing so for a long time. Defendant thought the conspiracy began before he went to jail.

(LD 4, pp. 3-19).

10

**DISCUSSION**

I.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Merced County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2)  resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. 326, 405-406 (2000).

11

1    A state court decision involves an "unreasonable application" of clearly established federal law "if the

2    state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable

3    manner." Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25

4    (2002)(per curiam).

5          Consequently, a federal court may not grant habeas relief simply because the state court's

6    decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable.

7    Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).  In

8    Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an

9    "unreasonable application" of federal law is an objective test that turns on "whether it is possible that

10   fairminded jurists could disagree" that the state court decision meets the standards set forth in the

11   AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Richter, 131 S.Ct. at 786.

12   As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an

13   unreasonable application of, clearly established Federal law" is "difficult to meet," because the

14   purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme

15   malfunctions in the state criminal justice systems,'" and not as a means of error correction.  Richter,

16   131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens,

17   J., concurring in judgment).  The Supreme Court has "said time and again that 'an *unreasonable*

18   application of federal law is different from an *incorrect* application of federal law.'" Cullen v.

19   Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus

20   from a federal court "must show that the state court's ruling on the claim being presented in federal

21   court was so lacking in justification that there was an error well understood and comprehended in

22   existing law beyond any possibility of fairminded disagreement." Richter, 131 S.Ct. at 787-788. Put

23   another way, a state court's determination that a claim lacks merit bars federal habeas relief so long as

24   "fairminded jurists could disagree" on the state court's decision.  Yarborough v. Alvarado, 541 U.S.

25   652, 664 (2004).

26          Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state

27   court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398 ("This backward-looking

28

language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520;  Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert. denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings.  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d),  the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991);  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis,

223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

"[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."

Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's

claims on procedural grounds or did not decide such claims on the merits, the deferential standard of

the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v.

Morgan, 313 F.3d at 1167.

      The prejudicial impact of any constitutional error is assessed by asking whether the error had

"a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding

that the Brecht standard applies whether or not the state court recognized the error and reviewed it for

harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate

prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S.

648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective

assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice

standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila

v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir.

2009).

### III.  Review of Petitioner's Claims.

      The instant petition itself alleges the following as grounds for relief: (1) ineffective assistance

of trial counsel; (2) violation of Petitioner's Due Process rights due to "cumulative effect" of errors at

trial; (3)  Petitioner's convictions for both the continuous sexual abuse and specific felony sex offenses

committed during the same period violated Petitioner's Due Process rights; and (4) the sentence

violates the federal ex post facto clause.

     A.  Ineffective Assistance of Counsel

      Petitioner first contends that he was denied his Sixth Amendment right to effect assistance of

trial counsel.  Specifically, Petitioner contends that his attorney's "unprofessional errors so upset the

adversarial balance between defense and prosecution that the trial was rendered suspect."  (Doc. 1, p.

14

5).  This contention is without merit.

       1.  <u>The 5th DCA's Opinion</u>.

The 5th DCA rejected Petitioner's claim as follows:

During the entirety of the criminal proceedings in this case, the People were represented by Deputy District Attorney David Sandhaus, and defendant was represented by appointed counsel, Richard Berger, of the public defender's office. Judge John D. Kirihara presided over the preliminary hearing, and Judge Hugh M. Flanagan presided over the lengthy jury trial.

Defendant contends his constitutional rights to due process and a fair trial were violated in this case. Defendant's due process arguments are based on what he describes as the "cumulative effect" of the conduct of the trial court, the prosecutor, and his defense counsel during the entirety of trial. Defendant asserts that misconduct committed by the court and the attorneys "permeated the atmosphere of the entire trial with unfairness...." Defendant acknowledges that his defense counsel's behavior may have contributed to this "atmosphere" and "antagonized" the court, but asserts the court's "exasperation" with the parties' behavior "seeped through" to the jury, and the court "conveyed to the jury its disdain" for defense counsel, thus resulting in the denial of his right to a fair trial.

In support of these allegations, defendant's opening appellate brief summarizes examples of purported judicial and prosecutorial misconduct, and responses to defense counsel's statements, supported by multiple string-citations to numerous pages in the lengthy reporter's transcript of this case. The appellate record consists of the transcripts for the preliminary hearing, lengthy pretrial motions, five days of voir dire, the two-week evidentiary portion of the jury trial, and two sentencing hearings. As we will explain, defendant has failed to clarify which of these incidents occurred in the jury's presence.

We have reviewed the entirety of the record and determined that the overwhelming majority of these purported incidents occurred outside the jury's presence, most of the incidents were triggered by defense counsel's conduct of repeatedly ignoring the court's orders and rulings, and the court displayed extraordinary patience and care in dealing with defense counsel's behavior. The few incidents that occurred in the jury's presence were limited to the court's attempts to control and maintain order over the proceedings. We will conclude that defendant's due process rights were not violated.

**A. Due process, the court's authority, and judicial misconduct**

A criminal defendant "has a due process right to an impartial trial judge under the state and federal Constitutions. [Citations.] The due process clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case. [Citation.]" (<u>People v. Guerra</u> (2006) 37 Cal.4th 1067, 1111 (<u>Guerra</u>).)

"Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused." (<u>Glasser v. United States</u> (1942) 315 U.S. 60, 71.) "'The object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered.' [Citation.] To this end, 'the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination.' [Citation.]" (<u>People v. Sturm</u> (2006) 37 Cal.4th 1218, 1237 (<u>Sturm</u>).)

"A trial court has inherent as well as statutory discretion to control the proceedings to ensure the efficacious administration of justice. [Citations.]" (<u>People v. Cox</u> (1991) 53 Cal.3d 618,

15

700, disapproved on other grounds in <u>People v. Doolin</u> (2009) 45 Cal.4th 390, 421, fn. 22.) "As provided by section 1044, it is 'the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.' However, 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant.' [Citation.]" (<u>Sturm</u>, supra, 37 Cal.4th at p. 1237.)

In exercising control over the proceedings, the judge "has a duty to be impartial and to make certain that the defendant in a criminal case is afforded a fair trial." (<u>People v. Blackburn</u> (1982) 139 Cal.App.3d 761, 764.) "'Every defendant [charged with a criminal offense] is entitled to a fair trial on the facts and not a trial on the temper or whimsies of the judge who sits in his case.'" (<u>People v. Mahoney</u> (1927) 201 Cal. 618, 626.)

"'[J]udges presiding at trials should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' [Citation.] "'The [trial] judge has a duty to be impartial, courteous and patient ... and its violation may be so serious as to constitute reversible error."' [Citation.] 'It is completely improper for a judge to advise the jury of negative personal views concerning the competence, honesty, or ethics of the attorneys in a trial.... When the court embarks on a personal attack on an attorney, it is not the lawyer who pays the price, but the client.' [Citation.]" (<u>People v. Burnett</u> (1993) 12 Cal.App.4th 469, 475.)

"A trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution. [Citations.]" (<u>People v. Carpenter</u> (1997) 15 Cal.4th 312, 353, superceded by statute on other grounds as stated in <u>Verdin v. Superior Court</u> (2008) 43 Cal.4th 1096, 1107–1108; <u>Sturm, supra</u>, 37 Cal.4th at pp. 1233, 1238.)

"Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. [Citation.] When 'the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge ... it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary.' [Citation.]" (<u>Sturm, supra</u>, 37 Cal.4th at p. 1233.)

The court commits misconduct when it makes disparaging comments, or implies that defense counsel is behaving unethically or in an underhanded fashion. However, it is not necessarily improper for a trial judge to object sua sponte or otherwise interrupt and disallow numerous questions asked by defense counsel, since "such interruptions or objections are certainly permissible under section 1044...." (<u>Sturm, supra</u>, 37 Cal.4th at p. 1241.) Moreover, "'[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.' [Citation.]" (<u>People v. Snow</u> (2003) 30 Cal.4th 43, 78 (<u>Snow</u>).) In addition, a trial court's "numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review. [Citations.]" (<u>Guerra, supra</u>, 37 Cal.4th at p. 1112.)

In order to preserve appellate review of allegations of judicial misconduct, a defendant must make timely objections and requests for admonitions, or show that objections would have been futile or admonitions ineffective to cure the errors. (<u>People v. Cash</u> (2002) 28 Cal.4th 703, 730.)

On appeal, we evaluate "'the propriety of judicial comment on a case-by-case basis, noting

whether the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial by jury.' [Citation.] 'The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made. [Citation.]' [Citation.]" (People v. Sanders (1995) 11 Cal.4th 475, 531–532.) " '[O]ur role ... is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' [Citation.]" (Snow, supra, 30 Cal.4th at p. 78.)

**B. The duties and responsibilities of the attorneys**

It is well recognized that the defendant's constitutional rights to due process and a fair trial also may be violated by prosecutorial misconduct. (People v. Hill (1998) 17 Cal.4th 800, 819 (Hill).) "A prosecutor's conduct violates the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's conduct that does not render a criminal trial fundamentally unfair violates California law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citation.]" (People v. Ervine (2009) 47 Cal.4th 745, 805–806 (Ervine).)

A prosecutor "is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the State. [Citation.]" (People v. Espinoza (1992) 3 Cal.4th 806, 820 (Espinoza).) Nevertheless, "all counsel are held to a uniform minimum standard of courtroom behavior, which is the professional standard of courtesy and decorum required for the pleading by counsel of causes at the bar. When counsel's conduct falls below the minimum standard, the conduct is unprofessional. The identical standard of professional behavior in court applies to prosecutor and defense counsel alike." (People v. Kelley (1978) 75 Cal.App.3d 672, 688 (Kelley), disapproved on other grounds in People v. Wright (1987) 43 Cal.3d 399, 414, fn. 18.)

"In the heat of trial and zeal of prosecution it is not uncommon for attorneys to overstep the bounds of propriety. It is always the duty of the trial court to curb such propensities and to make certain that members of the jury are not led astray by improper statements." (People v. Estrella (1953) 116 Cal.App.2d 713, 718.)

> "Attorneys representing defendants in criminal cases are frequently inspired with the justness of their causes to a degree which prompts undue enthusiasm and persistence. Their interest in a client should at no time be recognized as a justification for ignoring or disregarding the rulings of the court, but experienced jurists, also realizing the propensities of overzealous attorneys in such cases, are often confronted with situations requiring patience, tact, and firm but courteous behavior, lest those whose life or liberty is in the balance shall suffer through unpleasant controversies over which they have no control." (People v. North (1927) 81 Cal.App. 113, 121.)

"[I]t is the duty of the judge in the administration of justice to preserve the order of the court and to see that all persons whosoever, including the defendant, indulge in no act or conduct calculated to obstruct the administration of justice. [Citations.]" (People v. Barnhill (1960) 185 Cal.App.2d 645, 651.) "When an attorney engages in improper behavior, such as ignoring the court's instructions or asking inappropriate questions, it is within a trial court's discretion to reprimand the attorney, even harshly, as the circumstances require. [Citation.]" (Guerra, supra, 37 Cal.4th at p. 1111.) "[L]apses of behavior by defense counsel do not excuse professional misconduct by a deputy district attorney....'A prosecutor's misconduct cannot be justified on the ground that defense counsel "started it" with similar improprieties [citations].'" (Kelley,

17

supra, 75 Cal.App.4th at p. 690.)

With these principles in mind, we turn to defendant's contentions.

**C. Defendant's appellate arguments**

Given the manner in which defendant has raised these serious issues, we find it necessary to quote his opening brief's account of the purported due process violations which allegedly occurred during his trial. Defendant declares that beginning with voir dire and continuing through the trial, the prosecutor and defense counsel "bickered incessantly in front of and out of the presence of the jury and accused the other of misconduct," and defense counsel "engaged in long diatribes in which he argued with the court, accused the prosecution of misconduct and repeatedly asked for a mistrial."

Defendant asserts that defense counsel repeatedly accused the court of misconduct, bias, and favoring the prosecution over the defense, and the prosecutor repeatedly asked the court to find defense counsel in contempt and order sanctions against him. Defendant acknowledges the trial court "attempted to control the conduct of the trial," but argues that the court's "exasperation with defense counsel seeped through" and defense counsel's "repeated bad conduct during the trial ... so antagonized the trial court and likely prejudiced the jury that it denied his right to a fair trial."

As we have already mentioned, defendant's contentions on these points are supported by string citations to multiple pages in the voluminous reporter's transcript. Defendant seldom clarifies whether these incidents occurred in or out of the jury's presence. Defendant offers two specific examples of exchanges between the court and defense counsel which occurred during voir dire, but fails to explain whether the prospective jurors were present during these exchanges.

Defendant cites to the following incidents as examples where the court showed great exasperation with defense counsel and allegedly violated defendant's due process right to a fair trial, but he again hedges as to whether these incidents occurred in the jury's presence:

> "The court noted that defense counsel made spontaneous comments in front of the jury after the court rules on an objection.... During the trial, the court told defense counsel to be quiet.... Once it ordered him to sit down.... Three times when defense counsel asked for a break, the court denied his request or suggested that the jury and parties would wait for him if he had to leave. [Fn. omitted.] The third time, the court ultimately granted a 3–minute recess.... Once the court laughed during [defendant's] testimony...."

We note that to demonstrate error on appeal, an appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. (In re S.C. (2006) 138 Cal.App.4th 396, 408.) It is the duty of counsel to refer the reviewing court to the portion of the record which supports appellant's contentions on appeal. (Sakaguchi v. Sakaguchi (2009) 173 Cal.App.4th 852, 862 .)

While defendant's opening brief summarizes various exchanges between the court and the parties, and contains numerous citations to pages in the reporter's transcript, defendant fails to explain whether these particular incidents occurred in or out of the jury's presence in order to support his appellate argument that the court's alleged frustration with the parties "seeped through" and "likely prejudiced" the jury, and violated his right to a fair trial.

Nevertheless, given the serious nature of defendant's due process contentions, we have reviewed the entirety of the lengthy record in this case. We have paid particular attention to the incidents contained in the pages cited by defendant in his opening brief, and to the few specific

18

examples described in defendant's brief.

Our review reflects that defense counsel triggered nearly every incident cited to in defendant's brief, and, as we will explain, the record strongly suggests counsel did so for tactical reasons. The overwhelming majority of the incidents occurred outside the jury's presence, both the court and the prosecutor displayed admirable restraint during the very few incidents that occurred in the jury's presence, and there is absolutely no support to defendant's argument that he did not receive a fair trial.

We offer the following procedural summary in order to expedite our review of defendant's due process contentions.

## D. Summary of the record

During the preliminary hearing, an incident occurred between defense counsel and the prosecutor which seemed to set the stage for what was going to happen during the trial. C.C. testified at the preliminary hearing about how defendant touched her. The child started to cry and the prosecutor handed her the tissue box without making any comments. Defense counsel immediately objected to the prosecutor's act of handing over the tissue box, and declared the bailiff could "'attend to these matters.'" The prosecutor responded: "Go to hell." The court quickly calmed the parties and the preliminary hearing continued without incident.

On the first day of pretrial motions, prior to jury selection, defense counsel brought up the tissue box incident and complained the prosecutor committed misconduct when he handed the tissue box to the witness "on his own initiative." The court replied that the incident did not appear prejudicial and asked the parties to address other issues.

As the pretrial motions continued, the prosecutor and defense counsel argued between each other about alleged discovery violations, plea offers, and witness lists. The court ordered them to stop bickering and admonished both parties that it did not "want little picking back and forth at all. This is the first warning. Sanctions will occur if it occurs during the trial." Defense counsel asked if the court meant that it would impose sanctions if there was "petty squabbling or bickering." The court said, "Yes." Defense counsel said the court correctly believed there might be "some personal antipathy" between the attorneys, but he did not intend "to inject that into the proceedings." Defense counsel said he hoped the court would not overreact or "reflexively conclude that some exhibition of animosity" from the prosecutor or defense counsel might "erupt or blow up on the Defense causing the jury to think somehow that [the defendant] was responsible." The court replied:

> "Well, sir, that point's well taken. I have noticed that there has been some bickering back and forth even on these pretrial motions, and that's what I want to head off. I don't want to hear them. When we say, 'that's it,' that's what I mean."

While defense counsel said he understood the court's pretrial admonishments, he conducted himself in the opposite manner during five days of voir dire. During jury selection, the court held numerous conferences outside the presence of the prospective jurors and heard evidentiary issues and challenges for cause. During these conferences, outside the presence of the prospective jurors, defense counsel repeatedly complained the court allowed the prosecutor to "tak[e] the lead" and "assume leadership" of the court proceedings. Defense counsel made these complaints seemingly oblivious to the fact that the court was hearing motions made by the prosecutor, in which the prosecutor had the burden. Instead of responding to the prosecutor's arguments in support of these motions, however, defense counsel immediately complained that the court had been unfair and heard the prosecutor's arguments first. The court attempted to respond to defense counsel's objections, but defense counsel regularly interrupted

19

the court and insisted that the court would not listen to him, even as he kept talking and making more accusations against the court.

The court repeatedly interrupted voir dire and conducted conferences outside the presence of the prospective jurors, where defense counsel repeatedly made baseless accusations that the court prevented him from making or arguing objections, and that the court favored the prosecution when it heard motions. The court showed infinite patience with defense counsel's accusations, invited him to make his lengthy arguments, and then attempted to respond, but defense counsel kept talking and insisted that the court was preventing him from making his arguments.

Based on defense counsel's pretrial accusations and arguments, the prosecutor advised the court, outside the presence of the prospective jurors, that he feared defense counsel was going to act the same way in the jury's presence and intentionally provoke a mistrial during the evidentiary portion of the trial. The prosecutor declared that he would not respond in kind, but asked the court to consider imposing sanctions against defense counsel if he continued to engage in such conduct.

Outside the presence of the prospective jurors, the court advised the parties that sanctions were a serious matter; it would not allow a motion for sanctions to "color" the trial; and it would not consider any motions for sanctions until after the trial was over. Despite the court's rejection of the prosecutor's motion, defense counsel immediately complained that the court was being "complicit" with the prosecutor's request for sanctions and accused the court of becoming emotionally invested against defendant. The prosecutor asked the court to reconsider sanctions in light of defense counsel's response. The court refused and again said that defense counsel had the right to present the defense, and it would not make any peremptory rulings to prevent counsel from making objections or asking questions.

One incident occurred in the presence of the prospective jurors which was the direct result of defense counsel's conduct. Defense counsel made objections in the presence of the prospective jurors and then complained that the court improperly considered those objections in the venire's presence. The court denied defense counsel's objections but counsel continued to argue these points in the presence of the prospective jurors. The court immediately held a bench conference outside the presence of the prospective jurors, and defense counsel again claimed he was not being fairly treated by the court.

At the conclusion of voir dire, outside the jury's presence, the court made additional evidentiary rulings and defense counsel repeatedly interrupted the court. The court advised defense counsel: "I'd asked you privately there, sir, to see if you could conduct yourself without interrupting the Court. Now concentrate on not doing that."

Once the evidentiary portion of the trial began, the court conducted numerous conferences outside the jury's presence to consider the parties' motions and objections. At an early stage, the court conducted a hearing outside the jury's presence and ordered both parties to file written evidentiary motions so that it would not subject the jury to lengthy delays while it heard oral motions.

Despite this order, defense counsel repeatedly made oral motions on evidentiary matters without citations to legal authority. Outside the jury's presence, defense counsel continued to interrupt the court when it was ruling on evidentiary matters, and the prosecutor renewed his motion for sanctions. The court repeatedly advised the prosecutor and defense counsel not to bicker between themselves. The court rejected the prosecutor's renewed motion for sanctions because it would restrict the parties from being zealous advocates.

As the trial continued, defense counsel used the evidentiary conferences, outside the jury's presence, to renew his baseless allegations that the court refused to hear his objections and arguments. Defense counsel expanded his allegations and declared the court was "buying into" the prosecutor's renewed motion for sanctions. Again, outside the jury's presence, the court immediately admonished defense counsel that he had just accused the court of misconduct. Defense counsel denied he made such an accusation and insisted he was being respectful and dignified before the court.

At subsequent bench conferences outside the jury's presence, defense counsel accused the court of making arguments for the prosecutor, said that the court's rulings were calculated to favor the prosecutor, and accused the court of being "involved in some degree in the machinations" of the prosecutor. When the court admonished defense counsel for making meritless assertions of judicial misconduct, defense counsel accused the court of being "very thin-skinned" and being "complicit" with the prosecutor by denying defendant a fair trial.

As the trial continued, the court conducted additional hearings outside the jury's presence, during which defense counsel launched into lengthy declarations that the court refused to hear his objections, and accused the court of being "misled" by the prosecutor and not being "evenhanded" in its rulings. When challenged by the court, defense counsel immediately denied he accused the court of misconduct and declared he had been more respectful and dignified than the prosecutor.

At the half-way point of the trial, outside the jury's presence, the prosecutor stated he was about to rest his case. Defense counsel said he was going to move for acquittal and cited the wrong code section. The court instructed defense counsel to make his motion later on, and brought the jury back into the courtroom. Thereafter, the prosecutor stated that he rested his case. In the jury's presence, defense counsel made an oral motion for acquittal and complained that the court had criticized him for citing the wrong statute. The court asked defense counsel if he filed a written motion, counsel said no, and the court denied the motion. Defense counsel objected and the court immediately excused the jury.

Outside the jury's presence, defense counsel complained the court had criticized him before the jury, while failing to acknowledge that he had violated the court's order to defer making his motion for acquittal. Thereafter, defense counsel argued his motion for acquittal and it was denied.

After the jury returned the verdict, the prosecutor filed a written motion for sanctions against defense counsel and asserted that he intentionally violated the court's orders. At the two sentencing hearings, defense counsel did not appear and defendant was represented by another deputy public defender. The court considered and denied the prosecutor's motion for sanctions. In doing so, the court stated defense counsel was a diligent and effective advocate for the defendant during trial. However, the court also stated that defense counsel was the most disrespectful attorney the court had ever seen, and advised the Merced County Public Defender's Office that such conduct would not be tolerated in the future.

**E. There is no evidence of judicial or prosecutorial misconduct**

We reach several conclusions from our exhaustive review of the record, as summarized ante. First, there is absolutely no evidence in this record of either prosecutorial or judicial misconduct which prejudiced defendant or violated his due process right to a fair trial. The prosecutor did not engage in any conduct so egregious that it infected the trial with unfairness under either the federal or state standards for prosecutorial misconduct. (Ervine, supra, 47 Cal.4th at p. 805.) The court never displayed any bias against defendant, it did not commit any acts of judicial misconduct, it never discredited the defense in the jury's presence, and it never

21

allied itself with the prosecution at any time during the lengthy criminal proceedings. (<u>Sturm, supra</u>, 37 Cal.4th at pp. 1237–1238.)

Second, we agree with the trial court's observation that, despite his behavioral shortcomings, defense counsel was a diligent and effective advocate for defendant. Defense counsel successfully argued to exclude certain prosecution evidence, he skillfully cross-examined the child witnesses and their mothers, he questioned the children's memories as to when the molestations occurred, he tried to show the children and their mothers coordinated their stories against defendant, he used the testimony of Emma and Alejandro to show that other people had access to the computer which contained pornographic images, and he was initially successful in excluding evidence of defendant's jailhouse calls to Emma (a ruling which the court properly reconsidered when defendant testified).

Defense counsel's skilled advocacy was not lost on the jury. During deliberations, the jury asked to hear the testimony of nearly every child witness. More importantly, the jury did not simply return blanket guilty verdicts against defendant on the nine charged counts. Instead, after lengthy deliberations, the jury found him not guilty of the continuous sexual assault of S.C. (count I), and it was unable to reach a verdict on the misdemeanor pornography charge (count IX).

Third, while we agree with the trial court's statement that defense counsel was a diligent and effective advocate, we also agree with the court's observation that defense counsel was disrespectful throughout the entire trial. Defendant was extremely pugnacious and displayed great hostility toward the court and the prosecutor from the beginning of the criminal proceedings to the very end of this case. His conduct began almost immediately, without any apparent provocation by either the court or the prosecutor.

Nearly every incident cited in defendant's opening brief in support of his due process and judicial misconduct allegations are based on situations which occurred as a direct result of defense counsel's inappropriate statements and baseless accusations. Defense counsel seemed to make great efforts to antagonize and provoke both the court and the prosecutor. Given defense counsel's otherwise skilled representation of his client, the record suggests that defense counsel knowingly made the tactical decision to challenge the court's authority and impartiality at every step. Defense counsel's accusations were completely baseless and lacked any factual or legal support.

As defense counsel repeatedly accused the court of misconduct, the prosecutor voiced his fears that defense counsel would try to provoke a mistrial in the jury's presence. Both the court and the prosecutor displayed admirable restraint as defense counsel repeatedly made the very serious and completely meritless accusations that the court was biased and allied with the prosecutor. Defense counsel claimed that the court was not being evenhanded and would not listen to his arguments. However, his judicial misconduct allegations were counterintuitive since he made these accusations at lengthy hearings outside the jury's presence, when the court allowed defense counsel to make these points without interruption.

Fourth, the overwhelming majority of incidents cited by defendant in support of his judicial misconduct and due process arguments occurred outside the jury's presence. (<u>See Guerra, supra</u>, 37 Cal.4th at p. 1112 [no evidence of judicial misconduct where the trial judge was "outraged" at defense counsel but "all of his comments in this regard were made outside the presence of any jurors"].) In addition, the court and the prosecutor did not engage in any misconduct outside the jury's presence that would have chilled defense counsel's ability to be a zealous advocate for his client, prevented him from objecting to any matters that occurred during the trial, or deterred him from objecting to any perceived misconduct by the court or the prosecutor. (<u>Cf. Hill, supra</u>, 17 Cal.4th at pp. 819–822 [futile to object to prosecutorial

misconduct given the circumstances of the trial]; Sturm, supra, 37 Cal.4th at p. 1237 [defendant did not waive appellate review of judicial misconduct allegations because "any attempt by defense counsel to object" to the court's conduct would have been futile and counterproductive to his client].)

We further note that outside the jury's presence, the court repeatedly refused to consider the prosecutor's renewed motions for sanctions. The court said that sanctions were a serious matter and it would not do anything to restrict the attorneys from being zealous advocates. While the court declined to consider sanctions, it properly exercised its statutory and inherent authority to control the proceedings when it repeatedly admonished defense counsel to show respect for the proceedings and not to interrupt the court, argue motions after the court had ruled, or bicker with the prosecutor. The court had both the statutory and inherent authority to exercise "reasonable control of the trial" to avoid irrelevant or prolonged arguments on defense counsel's meritless accusations. (See, e.g., People v. Harris (2005) 37 Cal.4th 310, 348.)

Despite these admonishments, however, defense counsel continued to make the baseless accusation, outside the jury's presence, that the court favored the prosecution and that it was preventing him from being an effective advocate for defendant. The court properly responded to defense counsel's meritless and provocative allegations of misconduct, and the court's comments outside the jury's presence could not have adversely affected the jury.

Fifth, defendant claims the court was "so antagonized" by defense counsel's conduct that the court's hostility "likely prejudiced the jury" and denied his right to a fair trial. As we have explained, the overwhelming majority of incidents occurred outside the jury's presence. More importantly, however, there were only a few incidents and exchanges which occurred in the jury's presence, most of which occurred because defense counsel kept arguing evidentiary points in the jury's presence, made critical remarks after the court ruled against him, or intentionally brought up matters which the court had just addressed at conferences outside the jury's presence. Despite defense counsel's behavior, both the court and the prosecutor displayed admirable restraint and did not respond, in kind, to defense counsel's statements in the jury's presence.

## F. Sturm, Espinoza, Chong

Defendant contends his due process rights were violated in a manner similar to the prejudicial judicial misconduct that occurred in Sturm, supra, 37 Cal.4th 1218, a case in which the California Supreme Court held the defendant's right to a fair trial was violated in the penalty phase of a capital case. (Id. at p. 1244.) However, Sturm is factually inapposite to the instant case. In Sturm, the trial court repeatedly disparaged defense counsel in the jury's presence, implied he was deliberately asking improper questions, accused counsel of "purposely trying to 'sneak' in improper evidence by rephrasing his questions, and admonished the jury that defense counsel's questions were not evidence 'as much as he would like them to be evidence....'" (Id. at p. 1240.) The court expressed its disdain for and impatience with the defense experts in the jury's presence and created the impression that it was allied with the prosecution. (Id. at pp. 1241–1242.)

Sturm held that the trial court "interjected itself unnecessarily and inappropriately into the adversary process," and many of the court's comments "should have been made at sidebar, and not in front of the jury." (Sturm, supra, 37 Cal.4th at p. 1243.) It was "'completely improper for a judge to advise the jury of negative personal views concerning the competence, honesty, or ethics of the attorneys in a trial.... When the court embarks on a personal attack on an attorney, it is not the lawyer who pays the price, but the client.' [Citation.] This principle holds true in instances involving a trial judge's negative reaction to a particular question asked by defense counsel, regardless of whether the judge's ruling on the prosecutor's objection was

23

correct; even if an evidentiary ruling is correct, 'that would not justify reprimanding defense counsel before the jury.' ... [Citations.] The trial court's comments implying that defense counsel was behaving unethically or in an underhanded fashion, such behavior constitutes misconduct." (Id. at pp. 1240–1241.) Sturm concluded "[t]he numerous instances of misconduct created an atmosphere of unfairness and were likely to have led the jury to conclude that 'the trial court found the People's case against [defendant] to be strong and [defendant]'s evidence to be questionable, at best.' [Citation.]" (Id. at p. 1243.)

While defendant claims his trial was similar to the misconduct which occurred in Sturm, this case is much closer to the facts of Espinoza, supra, 3 Cal.4th 806, a case where defendant claimed "more than 100 on-the-record exchanges between the prosecutor and defense counsel ... indicate[d] an acrimonious relationship between the two attorneys," which included bickering between the parties, and defense counsel's accusations that the prosecutor was making faces and inappropriate comments in the jury's presence. (Id. at pp. 818–819.) Defendant argued the "frequent acrimonious exchanges" between the attorneys created a "'carnival atmosphere' uncontrolled by the trial court," and deprived him of his right of a fair trial. (Id. at p. 819.)

Espinoza rejected defendant's arguments based on the context in which the incidents occurred, and held defendant's due process rights were not violated:

"The exchanges between trial counsel to which defendant refers comprise but a small portion of a trial that extended over 10 months. By defendant's own description, most of these exchanges were 'petty.' Several took place outside the jury's presence and thus would not have been heard by the jurors. Those that were made in front of the jury were not protracted, and generally were promptly interrupted by the trial court when it warned counsel not to make personal comments, or ordered a recess, or admonished the jury to disregard any personal comments made by the prosecutor and defense counsel. [¶] Contrary to defendant's assertions, the acrimony that the attorneys exhibited towards each other during trial was not sufficiently extensive or uncontrolled to deprive defendant of a fair trial or to impair the reliability of the jury's penalty determination; thus, defendant's constitutional rights were not violated." (Espinoza, supra, 3 Cal.4th at p. 819, italics added.)

Espinoza also rejected defendant's argument that, while his own defense attorney "initiated much of the rancor," the prosecutor engaged in his own misconduct in response to defense counsel's conduct. (Espinoza, supra, 3 Cal.4th at p. 819.) Espinoza noted that it is "the duty of every member of the bar to 'maintain the respect due to the courts' and to 'abstain from all offensive personality[ ]' [Citation]." and a prosecutor is held to a higher standard than that imposed on other attorneys. (Id. at pp. 819–820.) However, the court concluded that the prosecutor's behavior, "though on occasion rude and intemperate," did not constitute misconduct, and the prosecutor's "lapses from courteous demeanor" during the lengthy trial "were occasional rather than systemic and pervasive." (Id. at p. 820.)

"[I]t is not reasonably likely that the jury would have understood the prosecutor's bickering with defense counsel, or his use of facial expressions or gestures to express dismay or disbelief, to be a personal attack on defense counsel's integrity. In all likelihood, the jury viewed such behavior as expressing merely a clash of personalities." (Espinoza, supra, 3 Cal.4th at pp. 820–821.)

Another situation similar to the instant case was addressed in People v. Chong (1999) 76 Cal.App.4th 232 (Chong ), where defendant argued his due process right to a fair trial was violated because the trial court made " 'hostile comments' " to his defense attorney in the jury's presence. Chong rejected defendant's arguments and found defense counsel displayed a

"disrespectful attitude" toward the court and the prosecutor, showed "disobedience" to the court's rulings, made "inappropriate comments" in the jury's presence, and repeatedly interrupted the proceedings. (<u>Id</u>. at p. 235.)

<u>Chong</u> held the incidents cited by the defendant did not establish judicial or prosecutorial misconduct, but instead represented defense counsel's "unprofessional conduct throughout the course of the trial," and reflected her "misguided trial tactics, which seemed to include alienating the witnesses, the prosecutor and the court, and baiting them to snap at her, thereby apparently attempting to create an impression that 'the system' was against the defendant." (<u>Chong, supra</u>, 76 Cal.App.4th at pp. 235, 242–243.) <u>Chong</u> further held it was appropriate for the court to "immediately admonish" defense counsel in the jury's presence "rather than continuously disrupt the trial by excusing the jurors and admonishing [counsel] outside their presence." (<u>Id</u>. at p. 235.) "[I]n light of the nature and extent of [defense counsel's] insolent and contemptuous conduct, the trial court's admonishments of [her] in front of the jury were necessary and did not constitute misconduct." (<u>Id</u>. at p. 243.)

<u>Espinoza</u> and <u>Chong</u> describe contentious situations which did not result in due process violations and are extremely similar to what happened during defendant's trial. In this case, as in <u>Chong</u>, defense counsel seemed determined to engage in "misguided trial tactics" to alienate the court, and attempted to bait the court and prosecutor to respond in kind, but neither the court nor the prosecutor took the bait and defendant's due process rights were not violated. (<u>Chong, supra</u>, 76 Cal.App.4th at p. 242.) In this case, as in <u>Espinoza</u>, the majority of incidents occurred outside the jury's presence, the comments made in front of the jury "were not protracted, and generally were promptly interrupted by the trial court," and the "acrimony that the attorneys exhibited towards each other during trial was not sufficiently extensive or uncontrolled to deprive defendant of a fair trial or to impair the reliability of the jury's penalty determination...." (<u>Espinoza, supra</u>, 3 Cal.4th at p. 819.) The trial court herein did not violate defendant's due process rights or commit misconduct on those few occasions when it was compelled to instruct defense counsel to "hush" or "sit down" in the jury's presence, and it properly acted to control the proceedings and prevent defense counsel from making inappropriate arguments or accusations in the jury's presence.

**G. Defendant's allegations that the court laughed at his trial testimony**

One of defendant's most serious specific allegations of judicial misconduct is that the trial court laughed at him during his trial testimony in the jury's presence. We have carefully reviewed this incident and disagree with defendant's interpretation of the exchange.

According to the reporter's transcript, defendant was on the stand, and defense counsel asked him about his pretrial statement to Officer Bleha, and to explain what he meant by certain responses:

> "[DEFENSE COUNSEL]: Did you ever ask Officer Bleha, you know, why is it that you keep telling me that it can't be an accident and then you keep suggesting it was? [¶] Did you ever ask him anything like that?

> "A. Yes, it crossed my mind.

> "THE COURT: Ha." (Italics added.)

Defense counsel did not stop or interrupt his direct examination and continued to ask defendant questions about his interview with Officer Bleha.

Defendant cites to the italicized word "Ha," as attributed to the court in the reporter's

25

transcript, and declares the court laughed at his testimony and discredited him in front of the jury. There are some problems with this contention. As we have explained, defense counsel repeatedly and unabashedly objected to and complained about numerous statements and rulings made by the court, and claimed the court committed misconduct and was allied with the prosecution. In this particular situation, however, defense counsel did not immediately object to whatever the court said at the time, he did not raise the matter at subsequent conferences, and he never accused the court of laughing during defendant's trial testimony.

An exchange occurred the following day which suggests a different interpretation of the word assigned to the court in the reporter's transcript. Outside the jury's presence, defense counsel moved for a mistrial and claimed the jury heard the court refer to defendant's prior drug convictions during a bench conference. The court agreed there was a reference to the drug convictions during the bench conference, but said the attorneys were standing on the opposite side of the bar from the jury box. The court said the parties talked in a low tone, nothing untoward happened, and he did not believe the jury heard anything. The reporter's transcript attributes the following words to the court in the course of this discussion:

> "And there is—ha, ha, ha, the only way you ever find out if they ever hear anything is to repeat the same question and have 'em all ask that, which of course would let the cat out of the bag and wouldn't be valuable either." (Italics added.)

As with the earlier attribution of the word "ha" to the court, defense counsel did not immediately object to this exchange, and he never claimed the court laughed at or denigrated counsel or defendant. Defense counsel's failure to object to these two incidents strongly implies that the court was not laughing, and that the court reporter may have misinterpreted whatever the court said or did at that time. (See Guerra, supra, 37 Cal.4th at p. 1112 [defendant's willingness to let particular matters pass without making trial objections of judicial misconduct "strongly suggests they are without merit"].) Given the state of the record, and the court's forbearance and fastidious effort to maintain order and conduct a fair trial, we reject defendant's contention that the court laughed at his testimony.

**H. Conclusion**

Finally, we note that defendant has not raised an ineffective assistance claim based on defense counsel's conduct at trial. Indeed, such an argument would be very difficult to make on this record. As we have explained, defense counsel was an extremely able advocate for defendant. While he was disrespectful to the court, his conduct seemed carefully calculated so that his most serious allegations of judicial and prosecutorial misconduct were made outside the jury's presence.

The record gives some credence to the prosecutor's speculation that defense counsel was trying to provoke a mistrial. Defense counsel repeatedly accused the court of allowing the prosecutor to control the proceedings, being in league with the prosecutor, and refusing to hear defense counsel's objections. Our review of the record completely refutes these allegations. As the trial progressed, however, defense counsel stepped up these baseless allegations and declared that the court had to declare a mistrial because of the court's alleged egregious misconduct.

The trial court was faced with an extremely difficult situation but handled it in an appropriate and professional manner. In Chong, supra, 76 Cal.App.4th 232, the court explained the duties of the trial court and the parties in a situation very similar to that which occurred in this case:

> "[A]n attorney, 'however zealous in his client's behalf, has, as an officer of the court, a paramount obligation to the due and orderly administration of justice....' [Citation.] An attorney must not willfully disobey a court's order and must maintain a respectful

26

attitude toward the court. [Citations.]

"When, during the course of trial, an attorney violates his or her obligations as an officer of the court, the judge may control the proceedings and protect the integrity of the court and the judicial process by reprimanding the attorney. [Citations.]

"Because 'events happen rapidly during the course of a trial ... it is not always feasible to excuse the jury in order that counsel may be reprimanded'; and, 'when counsel defies the authority of the court in the presence of the jury, it is sometimes necessary to reprimand counsel in the presence of the jury.' [Citation.]

"In fact, to allow an attorney to engage in unprofessional conduct before the jury without a prompt and strong response from the court undermines the judicial process. If, without rebuke, an attorney does not show proper respect for the judge and the proceedings, how can a juror be expected to do so? If an attorney is permitted to flout a court's ruling, how can a juror be expected to adhere to the rule of law as instructed by the court?

"By mocking the court's authority, an attorney in effect sends a message to the jurors that they, too, may disregard the court's directives and ignore its authority. This type of attorney misconduct must be dealt with in the jury's presence in order to dispel any misperception regarding the credence that jurors must give the court's instructions. Furthermore, when an attorney engages in repetitious misconduct, it is too disruptive to the proceedings to repeatedly excuse the jury to admonish counsel.

"For these reasons, the court may act swiftly and strongly in the presence of the jury to admonish an attorney if necessary to preserve the integrity of the judicial process." (Chong, supra, 76 Cal.App.4th at pp. 243–244.)

In this case, as in Chong, the trial court's comments "did not constitute judicial misconduct because they were appropriate responses to [defense counsel's] inappropriate remarks [citation], and because the comments did not discredit the defense theory or create an impression that the court was allying itself with the prosecution." (Chong, supra, 76 Cal.App.4th at p. 244.) As in Chong, the jury was instructed not to take anything the court said or did during the trial as an indication of what it thought about the evidence, the witnesses, or what the verdict should be. We presume the jury followed these instructions and did not penalize defendant because of anything said by the court in response to defense counsel's actions. (Chong, supra, 76 Cal.App.4th at pp. 244–245.)

We have examined each claimed instance of judicial and prosecutorial misconduct identified in defendant's brief in context. We conclude the overwhelming majority of incidents occurred outside the jury's presence, the court was "remarkably courteous and restrained" when dealing with defense counsel's baseless accusations, and defendant has failed to show "the jury was influenced in rendering its verdict." (Etzel v. Rosenbloom (1948) 83 Cal.App.2d 758, 762; Chong, supra, 76 Cal.App.4th at p. 245; cf. People v. Santana (2000) 80 Cal.App.4th 1194, 1207–1209["[b]y belaboring points of evidence that clearly were adverse to [defendant], the trial court took on the role of prosecutor rather than that of an impartial judge"]; People v. Perkins (2003) 109 Cal.App.4th 1562, 1567–1571.) "Although there were instances of judicial exasperation and unfiltered candor, the trial was protracted ... and the provocation substantial. Defense counsel often asked improper questions and flouted the court's rulings.... Much time was consumed on, at best, collateral matter.... Through it all, the trial court was protective of [defendant's] rights.... We are satisfied that [defendant was] afforded a fair trial." (People v. Burnett, supra, 12 Cal.App.4th at p. 476.)

27

(LD 4, pp. 19-42).

                  2.   <u>Federal Standard</u>.

                      a.   <u>Exhaustion</u>.

      A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).  The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991);  <u>Rose v. Lundy</u>, 455 U.S. 509, 518 (1982); <u>Buffalo v. Sunn</u>, 854 F.2d 1158, 1163 (9th Cir. 1988).

      A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court.  <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995); <u>Picard v. Connor</u>, 404 U.S. 270, 276 (1971); <u>Johnson v. Zenon</u>, 88 F.3d 828, 829 (9th Cir. 1996).  A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis.  <u>Duncan</u>, 513 U.S. at 365 (legal basis); <u>Kenney v. Tamayo-Reyes</u>, 504 U.S. 1, 112 S.Ct. 1715, 1719 (1992) (factual basis).

      Additionally, the petitioner must have specifically told the state court that he was raising a federal constitutional claim.  <u>Duncan</u>, 513 U.S. at 365-66; <u>Lyons v. Crawford</u>, 232 F.3d 666, 669 (9th Cir. 2000), *amended*, 247 F.3d 904 (2001); <u>Hiivala v. Wood</u>, 195 F.3d 1098, 1106 (9th Cir. 1999); <u>Keating v. Hood</u>, 133 F.3d 1240, 1241 (9th Cir. 1998).  In <u>Duncan</u>, the United States Supreme Court reiterated the rule as follows:

> In <u>Picard v. Connor</u>, 404 U.S. 270, 275 . . . (1971), we said that exhaustion of state remedies requires that petitioners "fairly presen[t]" federal claims to the state courts in order to give the State the "opportunity to pass upon and correct alleged violations of the prisoners' federal rights" (some internal quotation marks omitted).  If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.

<u>Duncan</u>, 513 U.S. at 365-366.  The Ninth Circuit examined the rule further, stating:

> Our rule is that a state prisoner has not "fairly presented" (and thus exhausted) his federal claims in state court *unless he specifically indicated to that court that those claims were based on federal law*. See Shumway v. Payne, 223 F.3d 982, 987-88 (9th Cir. 2000). Since the Supreme Court's decision in Duncan, this court has held that the *petitioner must make the federal basis of the claim explicit either by citing federal law or the decisions of federal courts, even if the federal basis is "self-evident*," Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999) (citing Anderson v. Harless, 459 U.S. 4, 7 . . . (1982), or the underlying claim would be decided under state law on the same considerations that would control resolution of the claim on federal grounds. Hiivala v. Wood, 195 F3d 1098, 1106-07 (9th Cir. 1999); Johnson v. Zenon, 88 F.3d 828, 830-31 (9th Cir. 1996); . . . .
>
> In Johnson, we explained that the petitioner must alert the state court to the fact that the relevant claim is a federal one without regard to how similar the state and federal standards for reviewing the claim may be or how obvious the violation of federal law is.

Lyons v. Crawford, 232 F.3d 666, 668-669 (9th Cir. 2000) (italics added), as amended by Lyons v. Crawford, 247 F.3d 904, 904-5 (9th Cir. 2001).

### b.   Ineffective Assistance of Counsel.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the appeal. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

Here, the state court identified the appropriate federal standard by applying Strickland.  Thus, the only issue is whether the state court's adjudication, i.e., that defense counsel's representation was neither deficient nor prejudicial, was not contrary to or an unreasonable application of Strickland.  For the reasons discussed below, the Court concludes that it was not.

> 3.  Analysis.

As a preliminary matter, Respondent argues that this claim is unexhausted.  Respondent is correct.

In the state appellate courts, the essence of Petitioner's claim was that the "cumulative effect" of the actions of the prosecutor, the trial judge, and Petitioner's attorney deprived Petitioner of his federal due process rights.  (Doc. 1, P. 18).  Nowhere in that claim did Petitioner argue that defense counsel's representation of Petitioner was ineffective under the Sixth Amendment.  This omission was also noted by the 5th DCA in its unpublished opinion.  (LD 4, p. 40).  Since the claim has never been presented to the California Supreme Court, it is unexhausted.  However, even were that not the case, the claim fails on its merits.

30

In rejecting the contention that Petitioner's counsel's conduct violated Petitioner's right to due process rather than the Sixth Amendment, the 5th DCA pointed out that Petitioner's attorney "triggered nearly every incident" to which Petitioner cites, but that counsel "did so for tactical reasons," i.e., to prompt a mistrial. The state court also observed that the "overwhelming majority of the incidents occurred outside the jury's presence."  Such discussions, held outside the presence of the jury, would not be likely to "upset" the adversarial balance contemplated by the Due Process clause because the jurors would be unaware of either the nature or tone of defense counsel's statements to the judge and prosecutor.  In sum, the state court concluded that "there is absolutely no support to defendant's argument that he did not receive a fair trial."

To the contrary, the 5th DCA concluded that defense counsel, far from being incompetent, was actually quite adept at representing his client, noting that he "successfully argued to exclude certain prosecution evidence," "skillfully cross-examined the child witnesses and their mothers," "tried to show that the children and their mothers coordinated their stories," used the testimony of Emma and Alejandro "to show that other people had access to the computer which contained pornographic images," and eventually obtained an acquittal on one count of continuous sexual abuse and a hung jury on the child pornography charge.  (LD 4, p. 32).  Even the trial judge, who referred to defense counsel as the most disrespectful attorney he had ever observed, thought that defense counsel was a diligent and effective advocate.  (5 Reporter's Transcript ("RT") 1130-1).  All of these circumstances support a conclusion that defense counsel was not deficient in his representation and that his conduct did not prejudice Petitioner.

Moreover, the state court could have reasonably rejected the implicit claim that counsel was ineffective because he sought to provoke a mistrial, since that was a tactical decision that a competent attorney could have made, given the seriousness of the charges and the abundance of eyewitness evidence against him. In determining whether or not ineffective assistance of counsel occurred, a trial attorney's strategic decisions are given wide deference and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. See Strickland, 466 U.S. at 689; United States v. Gibson, 690 F.2d 697, 703-04 (9th Cir.1982) (failure to make

31

1   evidentiary objections does not render assistance ineffective unless challenged errors can be shown to

2   have prejudiced the defense). Tactical decisions of trial counsel deserve deference when: (1) counsel

3   in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based

4   upon investigation; and (3) the decision appears reasonable under the circumstances. See <u>Sanders v.</u>

5   <u>Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

6         Ultimately, regardless of whether counsel actually intended to provoke a mistrial and

7   regardless of whether such a tactical decision is entitled to deference under <u>Strickland</u>, Petitioner

8   cannot show the requisite prejudice since counsel's aggressive style of representation, though at times

9   antagonizing to the prosecution and perhaps even to the trial judge, also showed skill and professional

10  competence that resulted in tangible benefits to Petitioner both during trial and in the jury's verdicts.

11  Most of these episodes were outside the presence of the jury, and the occasions that the trial judge

12  needed to instruct or reprimand defense counsel in the jury's presence were few in number and

13  minimal in their potential impact upon jurors.   Under such circumstances, the Court cannot conclude

14  that defense counsel's demeanor or abrasive style of advocacy during trial either fell below a

15  reasonable level of competence or prejudiced the outcome.   Accordingly, even had the state court

16  addressed the claim as one of ineffective assistance, the determination would not have been

17  objectively unreasonable.   Therefore, this claim should be rejected.

18         B.  <u>Violation of Due Process</u>

19         Petitioner next contends that the "cumulative effect of the conduct of the prosecutor, defense

20  counsel, and the court permeated the atmosphere of the entire trial and denied petitioner his due

21  process of the law and his right to a fair trial."  (Doc. 1, p. 7).  This contention is also without merit.

22              1.  <u>The 5th DCA's Opinion</u>.

23         The state court's discussion of this issue, intertwined with Petitioner's argument regarding

24  ineffective assistance of his trial counsel, was excerpted at length in the previous section and will not

25  be repeated again here.

26              2.  <u>Federal Standard</u>.

27         Regarding Petitioner's claims against the trial judge, the Due Process Clause guarantees a

28

32

criminal defendant the right to a "fair trial in a fair tribunal," which includes a trial judge with no actual bias.  Bracy v. Gramley, 117 S.Ct. 1793, 1797 (1997).  "Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the state and the accused denied the latter due process of law."  Tumey v. Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 444 (1927).  While the common law, statute, and professional standards may give guidance for when a judge should recuse himself or herself, only violations of the Constitution will result in the reversal of a conviction on writ of habeas corpus.  Bracy, 117 S.Ct. at 1797.  There are cases where a judge's implied bias creates such a high probability of actual bias as to violate the Constitution.  Withrow v. Larkin, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464 (1975).  For example, the Supreme court has found that Due Process requires disqualification of a judge when the judge has direct financial interest in the outcome of a case, see, e.g., Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 822-24, 106 S.Ct. 1580, 1586-87 (1986), is faced with substantial direct personal insults from a litigant, see, e.g., Taylor, III v. Hayes, 418 U.S. 488, 501-03, 94 S.Ct. 2697, 2704-06 (1974); Mayberry v. Pennsylvania, 400 U.S. 455, 466, 91 S.Ct. 499 (1971); or if he had significant prosecutorial and adjudicatory functions in the same case, see, e.g., In re Murchison, 349 U.S. 133, 134-6, 75 S.Ct. 623, 625 (1955).  These cases indicate a judge's implied bias violates the Constitution if the judge had "direct, personal [and] substantial" influences on him or some other incentive for bias.  See Aetna, 475 U.S. at 822, 106 S.Ct. at 1585.

Habeas relief, however, is limited to those cases where there is proof of actual bias or a possible temptation so severe that one might presume an actual, substantial incentive to be biased.  Del Vecchio v. Illinois Dept. of Corrections, 31 F.3d 1363, 1380 (7th Cir. 1994).  What might appear "bad" to an observer in hindsight might not have influenced or even had the real possibility to influence the judge.  See Del Vecchio, 31 F.3d at 1371. While the judge may have made rulings unfavorable to a petitioner, judicial rulings alone are not a basis for concluding that the judge was not impartial. See Liteky v. United States, 510 U.S. 540, 551 (1994) (stating that judicial rulings alone almost never constitute valid basis for finding bias).

As for misconduct by the prosecution, the United States Supreme Court has held that a

defendant's due process rights are violated if prosecutorial misconduct renders a trial "fundamentally unfair," that is, if the misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.  Darden v. Wainwright, 477 U.S. 168, 183 (1986); Drayden v. White, 232 F.3d 704, 711 (9th Cir.2000).  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."  Greer v. Miller, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (quoting United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985)).  Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial - i.e., that absent the alleged impropriety, the verdict probably would have been different.

          3. Analysis.

      The Court has previously addressed, and rejected, Petitioner's claim that his defense counsel was ineffective and engaged in conduct that altered the balance between the prosecution and the defense.  This claim, however, contains two additional components, i.e., purported misconduct by the prosecution and by the trial court.  Both contentions are misguided.

      First, there is no indication whatever that the trial judge had any financial interest in the outcome of Petitioner's case, that he had been subjected to substantial personal insults from Petitioner, or that he had a prosecutorial function related to Petitioner in this case or some earlier case.  Moreover, the gravamen of Petitioner's claim against the court was alleged laughter and the court's ongoing need to verbally remonstrate with and rein in defense counsel due to counsel's overly contentious style.  As the 5th DCA noted, however, the transcripts indicating laughter could be misconstrued to be something they were not.  The lack of response, comment, or objection by anyone at the time the laughter is alleged to have occurred strongly supports the 5th DCA's view that the court's conduct did not appear to be laughter to those in the courtroom and that the trial court's comments and demeanor were misinterpreted by the court reported.  Second, as the 5th DCA pointed out, the occasions on which the court had to reprimand defense counsel in the presence of the jury were few and not particularly egregious.

      Habeas relief is limited to those cases where there is proof of actual bias or a possible

temptation so severe that one might presume an actual, substantial incentive to be biased.  See Del Vecchio, 31 F.3d at 1380.  Although Petitioner points to the trial court's "exasperation" and frustration with counsel's conduct, there is simply no evidence whatever of any judicial bias in this case that could form the basis of a constitutional claim.

Regarding prosecutorial misconduct, Petitioner primary complaint appears to be that the prosecutor repeatedly resisted defense counsel's strenuous and contentious efforts to represent Petitioner, and even went so far as to suggest on multiple occasions that sanctions be imposed against Petitioner's attorney.  However, Petitioner does not point to any specific act that could be characterized as misconduct for Due Process purposes.  He makes no allegation that the prosecution withheld evidence, manufactured evidence, falsified evidence, or attempted to elicit inadmissible evidence.  Petitioner does not contend that the prosecution made improper comments to the jury or otherwise attempted to subvert the trial process or violate Petitioner's right to a fair trial. While it does appear that both counsel in this case did their best to make the "adversarial process" truly adversarial, that, by itself, is no basis on which to predicate a claim of prosecutorial misconduct.  The prosecution had a duty to diligently and forcefully represent the People of the State of California just as much as defense counsel had a similar duty to represent Petitioner.  No fault arises from counsel zealously representing his client, and certainly nothing in the record even remotely suggests that the prosecutor's conduct rendered the trial "fundamentally unfair" or infected the trial with unfairness so as to make the resulting conviction a denial of due process.  Darden v. Wainwright, 477 U.S. at 183.  Accordingly, this claim should be rejected.

C.  Due Process Violation As To Convictions

Next, Petitioner claims that he could not be convicted of both continuous sexual abuse and specific felony sex offenses committed during the same period without violating federal due process guarantees.  This contention too is without merit.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Defendant's next argument is based on the multiple charges and convictions for molesting C.C. and Y.C.  As to C.C., he was charged with and convicted of count III, continuous sexual abuse

(§ 288.5); count IV, commission of a lewd act (§ 288, subd. (a); and count V, commission of a forcible lewd act (§ 288, subd. (b)), with all counts committed from August 31, 2002, to August 30, 2004.

As to Y.C., he was charged with and convicted of count VI, continuous sexual abuse; count VII, commission of a lewd act; and count VIII, commission of forcible lewd act, with all counts committed from April 4, 1998, to April 3, 2000.

Defendant contends that as to C.C. and Y.C., he could not be charged and convicted of continuous sexual abuse of each child in violation of section 288.5 (counts III and VI) and also convicted of committing specific sexual acts on each child during the same period of time (counts IV and V; counts VII and VIII). Defendant asserts that the charges should have been alleged in the alternative, and that this court must reverse all his convictions for offenses committed against C.C. and Y.C. (counts II through VIII) since alternative charges were never presented to the jury.

The People agree that defendant was improperly convicted of both continuous sexual abuse and specific sexual offenses against both C.C. and Y.C., but assert the remedy is simply to strike one or more of the multiple convictions as to each victim.

**A. Section 288.5**

Section 288.5 was enacted in 1989 and "defines the crime of continuous sexual abuse of a child. Any person who either resides in the same home with a minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with the child or three or more acts of lewd or lascivious conduct, is guilty of the offense of continuous sexual abuse. [Citations.]" (People v. Johnson (2002) 28 Cal.4th 240, 242 (Johnson).) The statute was enacted to solve "a recurrent problem in the prosecution of so-called resident child molesters: Because of the age of the victim and the repeated and continual nature of the offenses, trial testimony often failed to identify with specificity the date or place of particular charged acts, and the defense's ability to respond to specific charges arguably was impaired." (Ibid.) In a prosecution under section 288.5, "the trier of fact need unanimously agree only that the requisite number of specified sexual acts occurred, not which acts constituted the requisite number. [Citation.]" (Johnson, supra, at p. 243.)

However, section 288.5 "imposes certain limits on the prosecution's power to charge both continuous sexual abuse and specific sexual offenses in the same proceeding." (Johnson, supra, 28 Cal.4th at p. 243.) Section 288.5, subdivision (c) provides that a defendant "may be charged with only one count of continuous sexual abuse unless multiple victims are involved, in which case a separate count may be charged for each victim. [Citation.]" (Johnson, supra, 28 Cal.4th at p. 243.)

As relevant to this case, section 288.5, subdivision (c) provides another limitation:

> "No other act of substantial sexual conduct, as defined in subdivision (b) of Section 1203.066, with a child under 14 years of age at the time of the commission of the offenses, or lewd and lascivious acts, as defined in Section 288, involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative ...." (Italics added.)

In Johnson, supra, 28 Cal.4th 240, the California Supreme Court interpreted this portion of section 288.5, subdivision (c), in a case where the defendant was charged with both continuous

sexual abuse and specific sexual offenses committed against the same child during the same time period. The charges were not alleged in the alternative, all the charges were presented to the jury, and the defendant was convicted of all the offenses. (<u>Id</u>. at pp. 243–244 .)

<u>Johnson</u> held that "section 288.5, subdivision (c) clearly mandates the charging of continuous sexual abuse and specific sexual offenses, pertaining to the same victim over the same period of time, only in the alternative ...." (<u>Johnson, supra</u>, 28 Cal.4th at p. 248, italics added.) As a result, a prosecutor "may not obtain multiple convictions" if the defendant has been charged with both continuous sexual abuse and discrete sexual offenses, pertaining to the same victim in the same period of time. (<u>Ibid.</u>, italics added.) <u>Johnson</u> held the defendant had been improperly convicted of both continuous sexual abuse, and specific sexual offenses committed against the same child in the same time period, because the multiple convictions were "inconsistent" with section 288.5, subdivision (c). (<u>Johnson, supra</u>, at p. 248.)

It is thus settled that the language of section 288.5, subdivision (c) "is unambiguous. A specific sexual offense involving the same victim may be charged in the same proceeding with a continuous sexual abuse charge only if the specific sexual offense occurred outside the time period of the continuous sexual abuse charge or is charged in the alternative." (<u>Alvarez, supra</u>, 100 Cal.App.4th at p. 1176, italics in original.)

As applied to the instant case, defendant contends, and the People concede, that as to C.C., he was improperly convicted of continuous sexual abuse in violation of section 288.5 (count III), together with specific sexual offenses committed against the same child during the same period of time (counts IV and V). The parties similarly agree that as to Y.C., defendant was improperly convicted of both continuous sexual abuse in violation of section 288.5 (count VI), together with specific sexual offenses committed against the same child during the same time period (counts VII and VIII). As in <u>Johnson</u>, the multiple charges were not alleged in the alternative and defendant was convicted on all counts, which is prohibited by section 288.5, subdivision (c).

**B. Remedy for multiple convictions in violation of section 288.5**

While the parties agree that defendant was improperly convicted of multiple counts based on C.C. and Y.C., they disagree as to the remedy for these multiple convictions. Defendant asserts that since section 288.5, subdivision (c) requires the multiple charges to be alleged in the alternative for the jury to decide, this court must reverse all convictions based on C.C. and Y.C. since the jury never addressed the alternative charges. The People strongly disagree and assert this court should follow <u>Johnson</u> and find that some but not all of the multiple convictions may be stricken.

A series of cases have considered the appropriate remedy when a defendant is convicted of multiple sexual offenses in violation of section 288.5, subdivision (c). In <u>Johnson</u>, the California Supreme Court held that "either the continuous abuse conviction or the conviction on the specific offenses must be vacated" when there are multiple convictions in violation of section 288.5, subdivision (c). (<u>Johnson, supra</u>, 28 Cal.4th at p. 245.) <u>Johnson</u> approved the appellate court's suggested remedy in that case, to affirm the defendant's conviction for continuous sexual abuse and reverse the convictions for the specific sexual offenses. (<u>Id</u>. at p. 248.)

In <u>Johnson</u>, however, "the question of which of the alternative convictions should be reversed, ... was not at issue," and the court "never reached the question of when, and under what circumstances the proscription against multiple convictions in section 288.5, subdivision (c) could be remedied instead by reversing the section 288.5 conviction." (<u>People v. Torres</u> (2002) 102 Cal.App.4th 1053, 1057 (<u>Torres</u>).)

37

In <u>Torres</u>, the court addressed the specific question left unanswered by <u>Johnson</u>. The defendant in <u>Torres</u> was charged and convicted of continuous child sexual abuse in violation of section 288.5, along with 10 individual sexual offenses against the same victim committed during the same time period; the charges were not alleged in the alternative. The defendant was sentenced to upper consecutive terms for some of the individual sexual offenses, and the court stayed the lower term imposed for continuous sexual abuse. (<u>Torres, supra</u>, 102 Cal.App.4th at p. 1056.) <u>Torres</u> relied on <u>Johnson</u> and held the defendant was improperly convicted of continuous sexual abuse and other sexual offenses based on the same victim in the same time period, in violation of section 288.5, subdivision (c). (<u>Torres, supra</u>, at pp. 1056–1057.)

<u>Torres</u> then posed the question, "which convictions should be vacated" in light of the violation of section 288.5, subdivision (c). (<u>Torres, supra</u>, 102 Cal.App.4th at p. 1057.) <u>Torres</u> acknowledged that <u>Johnson</u> approved the remedy of affirming the continuous sexual abuse conviction and vacating the specific sexual offenses in that case, but noted that <u>Johnson</u> did not address this specific issue and required "nothing more than vacation of either the continuous sexual abuse conviction or the convictions on the specific sexual offenses. [Citation.]" (<u>Torres, supra</u>, 102 Cal.App.4th at p. 1057, italics in original.)

<u>Torres</u> held that section 288.5, subdivision (c) "gives the prosecutor maximum flexibility to allege and prove not only a continuous sexual abuse count, but also specific felony offenses commensurate with the defendant's culpability, subject only to the limitation that the defendant may not be convicted of both continuous sexual abuse and specific felony sex offenses committed in the same period. It therefore is also appropriate, in deciding which convictions to vacate as the remedy for a violation of the proscription against multiple convictions set forth in section 288.5, subdivision (c), that we leave [the defendant] standing convicted of the alternative offenses that are most commensurate with his culpability." (<u>Torres, supra</u>, 102 Cal.App.4th at p. 1059, first and second italics in original, third italics added.)

<u>Torres</u> thus concluded "that in the appropriate case we may vacate the section 288.5 conviction when the proscription against multiple convictions in section 288.5, subdivision (c) is violated...." (<u>Torres, supra</u>, 102 Cal.App.4th at p. 1060.) <u>Torres</u> further held that it would be " 'anomalous' " to conclude that a court was required to reverse a defendant's convictions for specific sexual offenses and affirm the section 288.5 conviction in certain cases, regardless of the impact on defendant's sentence, because "'section 288.5, adopted to prevent child molesters from evading conviction, could be used by those molesters to circumvent ... convictions with more severe penalties and prior strike consequences than available ... under section 288.5.' [Citation.]" (<u>Torres, supra</u>, 102 Cal.App.4th at pp. 1060–1061.)

<u>Torres</u> thus decided to reverse the defendant's conviction for continuous sexual abuse and affirm the 10 separate felony sex offenses, because based on "the number and severity of these specific offenses, [defendant] faced a greater maximum aggregate penalty with respect to these than he did on the continuous sexual abuse offense," and the trial court imposed "a greater aggregate sentence with respect to the specific offenses than on the section 288.5 offense, and stayed execution of sentence on the latter." (<u>Torres, supra</u>, 102 Cal.App.4th at p. 1060.)

In <u>People v. Bautista</u> (2005) 129 Cal.App.4th 1431 (<u>Bautista</u>), the defendant pleaded no contest to one count of continuous sexual abuse of a child and multiple counts of procurement of a child for lewd and lascivious acts, based on the same victim within the same time period. <u>Bautista</u> held the defendant could not be convicted of both continuous sexual abuse and procurement of the same child during the same time period, pursuant to section 288.5, subdivision (c) and Johnson. (<u>Bautista, supra</u>, at pp. 1433, 1436–1437.)

As for the appropriate remedy, <u>Bautista</u> agreed with <u>Torres</u> and held that when either a continuous sexual abuse conviction or specific felony offenses must be vacated for a violation

38

of section 288.5, subdivision (c), the defendant should be left standing convicted of the alternative offenses that are most commensurate with his or her culpability. Bautista affirmed the defendant's conviction for continuous sexual abuse and vacated the procurement convictions, and found that the procurement convictions were not proportionate to the defendant's the egregious criminal conduct in that case. (Bautista, supra, 129 Cal.App.4th at pp. 1437–1438.)

**C. Analysis**

Based on Johnson, Torres, and Bautista, it is clear that while defendant was improperly convicted of multiple offenses in violation of section 288.5, subdivision (c) as to both C.C. and Y.C., the appropriate remedy as to each victim is to reverse either the continuous sexual abuse convictions (counts III and VI) or the specific sexual offense convictions (counts IV, V, VII, and VIII), so that defendant is left convicted "of the alternative offenses that are most commensurate with his culpability." (Torres, supra, 102 Cal.App.4th at p. 1059.)

Defendant acknowledges the holdings in these cases but argues that merely vacating one conviction and affirming the others would violate his due process rights. Defendant asserts that since section 288.5, subdivision (c) requires that the charges be alleged in the alternative and presented to the jury, a reviewing court cannot decide which convictions to reverse or affirm and the question should have been decided by the jury.

Defendant's due process argument is based on Hicks v. Oklahoma (1980) 447 U.S. 343 (Hicks), in which a defendant who was convicted in Oklahoma was entitled to have a jury fix his or her punishment under statutory law. The Oklahoma trial court instructed the jury in accordance with the recidivist statute then in effect, that if it found the defendant guilty, it was required to impose a mandatory 40–year prison term. The jury returned a guilty verdict and imposed the mandatory term. (Id. at pp. 344–345.) In an unrelated case, the Oklahoma Court of Criminal Appeals declared the mandatory 40–year sentence unconstitutional. The defendant relied on that decision and tried to set aside his own jury-imposed mandatory sentence. The state court denied his motion and held the unconstitutional statute did not prejudice the defendant, because his sentence was within the range of punishment which the jury could have imposed. (Id. at pp. 344–345.)

In Hicks, the United States Supreme Court vacated the judgment and held that where a state has provided for the imposition of criminal punishment in the jury's discretion, the defendant has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury's exercise of its discretion, and there was a substantial possibility the jury would have returned a sentence of less than 40 years had it been instructed correctly. (Hicks, supra, 447 U.S. at pp. 345–346.)

Defendant relies on Hicks and claims his convictions based on the molestations of C.C. and Y.C. (counts II through VIII) must be reversed since section 288.5, subdivision (c) represents the Legislature's decision that a jury must decide between alternative sexual molestation charges. Defendant argues that his convictions for multiple sex offenses in violation of section 288.5 constitute structural error which requires automatic reversal. However, Hicks is inapplicable to this case and defendant's argument is meritless because the question of whether the jury or the trial court determines which alternative charge the defendant shall stand convicted is not at issue for violations of section 288.5, in contrast to the Oklahoma statute interpreted in Hicks.

We thus conclude that this court, or the superior court, retains discretion to "leave [defendant] standing convicted of the alternative offenses that are most commensurate with his culpability ." (Torres, supra, 102 Cal.App.4th at p. 1059.) We note that defendant was

sentenced to 15 years to life on all counts in this case, some of which were consecutive while others were concurrent.

(LD 4, pp. 50-57).

        2.  <u>Analysis</u>.

California specifically criminalizes the repeated sexual abuse of a child by a person who resides in the same household:

> Any person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense ... or three or more acts of lewd or lascivious conduct under Section 288, with a child under the age of 14 years at the time of the commission of the offense[,] is guilty of the offense of continuous sexual abuse of a child....

California Penal Code § 288.5(a). Section 288, in turn, deems a felony "any lewd or lascivious act ... upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child."

Here, the evidence was overwhelming that Petitioner had recurring access to the three victims for more than three months, that each child was younger than 14 at the time, and that the charged acts qualify as lewd or lascivious conduct.  Rather, Petitioner questions the procedures that resulted in his conviction.

Petitioner contends that, where charged under both statutes and convicted as to victims Y.C. and C.C., and where state law provides only for conviction in the alternative, the state court cannot choose which statute is the basis for the conviction without violating Petitioner's due process rights under the Fourteenth Amendment.

As the 5th DCA pointed out, under California law, a defendant cannot be convicted of both continuous sexual abuse in violation of § 288.5 and with specific sexual offenses committed against the same child during the same period of time.  (LD 4, pp. 56-57).  However, the state court went on to explain that, under California case law, when a defendant is convicted of both, the responsibility for determining which conviction to use for sentencing purposes is left to the trial court, based on that court's determination as to which offense is "most commensurate with [defendant's] culpability."  (LD

40

4, pp. 56-57).

Petitioner claims arises from the application of California case law to its criminal statutes related to child sexual assault.  As such, the claim is not cognizable in a federal habeas corpus petition. Estelle, 502 U.S. at 68. The fact that Petitioner characterizes his claim as a due process violation is irrelevant. A habeas petitioner may not transform a state law issue into a federal one merely by asserting a due process violation. Langford v. Day, 110 F.3d 1380, 1389 (9th Cir.1996).

Moreover, in order for a state law to create a liberty interest protected by the United States Constitution, the state law must meet two requirements: the law must set forth substantive predicates to govern official decision-making, and it must contain explicitly mandatory language, i.e., a specific directive to the decision-maker that mandates a particular outcome if the substantive predicates have been met.  Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 462–463, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); Bonin v. Calderon, 59 F.3d 815, 842 (9th Cir. 1995). Neither of these requirements were met in this instance.  Rather, the judicial decision is a discretionary one based upon the judge's assessment of which alternative is most commensurate with the petitioner's conduct. Therefore, there is thus no basis upon which to find a federal liberty interest. Clemons v. Mississippi, 494 U.S. 738, 747, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (no liberty interest where state did not create entitlement).  Without a state liberty interest, Petitioner's claim fails.

In addition, the violation of state law results in a due process violation only if the sentence is arbitrary or capricious. Richmond v. Lewis, 506 U.S. 40, 50 (1992). Here, to the contrary, state law requires the court to impose sentence on the alternative offense "that is most commensurate with his culpability." Torres, 102 Cal.App.4[th] at 1059.  Petitioner does not argue that the trial judge abused this discretion; rather, he contends that vesting any discretion in the trial judge, rather than in the jury, was a violation of federal due process.  Petitioner cites no clearly established federal law, and the Court is aware of none, that precludes a state from delegating this statutory function to the trial judge. Accordingly, the state court adjudication was not contrary to nor an unreasonable application of clearly established federal law.

///

41

D.  Ex Post Facto Violation

Finally, Petitioner argues that his sentence violates the federal prohibition against ex post facto punishment, contending that the trial court committed error "when it sentenced petitioner to 15 years to life for the continuous abuse of a child."  (Doc. 1, p. 10).  On appeal, Petitioner challenged his sentences on counts III and VI on ex post facto grounds.  The state court essentially agreed with Petitioner and granted him relief.

1.  The 5th DCA's Opinion.

The 5th DCA agreed with Petitioner as follows:

> As explained ante, section 667.61 provides for the imposition of a harsher sentence if the defendant commits an offense as enumerated in section 667.61, subdivision (c), under one of the circumstances listed in section 667.61, subdivision (e). Defendant's ex post facto challenge to counts III and VI is meritorious based on the analysis in Palmer. In count III, defendant was convicted of the continuous sexual abuse of C.C., in violation of section 288.5, from August 31, 2002, to August 30, 2004. In count VI, he was convicted of committing the same offense against Y.C. from August 31, 2002, to August 30, 2004. In this case, as in Palmer, defendant committed the underlying offenses of continuous sexual abuse against both C.C. and Y.C. at a time when a violation of section 288.5 was not listed in section 667.61, subdivision (c) as an enumerated offense to trigger the application of the one strike law, regardless of whether the multiple victim circumstance otherwise existed. As explained in Palmer, defendant could not be sentenced under the one strike law based on the commission of underlying offenses that were not enumerated in section 667.61, subdivision (c) when he committed the offenses.

> We thus conclude that defendant could not be sentenced pursuant to the one strike law as to both counts III and VI, because the imposition of indeterminate life terms for those convictions violates the constitutional prohibition against ex post facto laws.

> As we will explain in part III, post, the matter must be remanded for other reasons, and the trial court will have the discretion to re-impose the remaining one-strike sentences in this case.

(Doc. 4, p. 45).

2.  Analysis.

The case or controversy requirement of Article III of the Federal Constitution deprives the Court of jurisdiction to hear moot cases.  Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 104 S.Ct. 373, 374-75 (1983); N.A.A.C.P., Western Region v. City of Richmond, 743 F.2d 1346, 1352 (9th Cir. 1984).  A case becomes moot if the "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Murphy v. Hunt, 455 U.S. 478, 481 (1982).  The Federal Court is "without power to decide questions that cannot affect the rights of the litigants before

42

them." North Carolina v. Rice, 404 U.S. 244, 246 (1971) *per curiam*, *quoting* Aetna Life Ins. Co. v. Hayworth, 300 U.S. 227, 240-241 (1937).

As Respondent correctly points out, Petitioner raised this issue in the 5th DCA, which ultimately agreed with Petitioner, as indicated by the ruling above.  Since Petitioner has been accorded the relief he requested, the issue is now moot and this Court has no authority to grant a writ of habeas corpus on a moot claim.  North Carolina v. Rice, 404 U.S. at 246.

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 21 days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **March 18, 2014**                         **/s/ Jennifer L. Thurston**
                                                     UNITED STATES MAGISTRATE JUDGE

43